UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEBRA CZAJKA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 24-cv-11030 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| ANOVION, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Debra Czajka worked for a year at Anovion, LLC, a company that makes material for lithium-ion batteries. The company receives significant funding from the federal government through grants. Czajka helped the company apply for the grants and comply with federal requirements.

Within a few months, Czajka came to believe that Anovion was out of compliance with federal regulations. She thought that the company failed to keep all of the necessary records. And she suspected that the company didn't report budget overruns, either, despite an obligation to give notice to the Department of Energy.

Czajka shared her concerns with three of her supervisors. But her complaints didn't go anywhere. If anything, they backfired.

Not long after speaking up about the property records, Czajka heard from a supervisor that the company was considering dropping her position. She was on shaky ground, and before long, the ground fell beneath her feet. After raising concerns about budget overruns, Czajka was fired.

Czajka responded by filing suit. She brings a retaliation claim under the False Claims Act, plus a retaliatory-discharge claim under state law. Anovion moved to dismiss.

For the following reasons, Anovion's motion to dismiss is denied.

### Background

At the motion-to-dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast

the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020).

Debra Czajka was a schoolteacher for 29 years. *See* Cplt., at ¶ 9 (Dckt. No. 1). After decades of teaching, she wanted to develop some new skills and expertise. So she took a job at Anovion, LLC, in November 2022. *Id.* at ¶¶ 7–9.

Anovion manufactures "premium, anode-grade synthetic graphite," which is used to make lithium-ion batteries. *Id.* at ¶ 6. But Czajka didn't work on the technical side of the company.

Czajka was a Government Programs Manager. *Id.* at ¶ 7. Her duties included "identifying and applying for government grants, in addition to ensuring that Anovion complied with its grant agreements and the corresponding federal regulations." *Id.* at ¶ 10.

Czajka's problems at Anovion began with a grant from the U.S. Department of Energy. Anovion received a grant of $117 million to expand its domestic production of synthetic graphite anode. *Id.* at ¶ 12.

The grant came with a few strings attached.

The grant was a cost-share grant, meaning that the company had to raise funds, too. Anovion needed to "raise and contribute $294 million of other non-federally sourced funds during the award period." *Id.* at ¶¶ 13–14. And each quarter, "a specified percentage of the $294 million [had to] be contributed to the projects covered under the cost-sharing agreement." *Id.* at ¶ 15.

If Anovion couldn't meet those requirements, the company had to "immediately provide written notification to the DOE Award Administrator indicating whether [Anovion] will continue or phase out the project." *Id.* at ¶ 16.

The grant also required Anovion to submit quarterly performance reports to the Department of Energy. The company needed to give a "status report on Anovion's adherence to the budget provided to the federal government in its grant application." *Id.* at ¶ 17.

The company needed to comply with the budgetary and cost-sharing requirements to keep getting federal funds. "Anovion's ability to continue receiving grant funds was predicated on its ability to stay within its stated budget and to meet its quarterly cost share requirements." *Id.* at ¶ 18.

Czajka came to believe that the company wasn't living up to its end of the deal, on two different fronts. As she saw things, the company failed to keep property records, and failed to stay within the budget.

*Anovion's Property Records*

The first issue involved recordkeeping requirements.

In August 2023, while Czajka was at a training session, she learned that Anovion was not in compliance with the requirements for federal grantees. *Id.* at ¶ 21. Specifically, she thought that Anovion's property records did not comply with federal regulations. *Id.* at ¶ 22.

Federal grantees must maintain a laundry list of property records. The list includes "a description of the property, a serial number or another identification number, the source of funding for the property (including the [Federal Award Identification Number]), the title holder, the acquisition date, the cost of the property, the percentage of the Federal agency contribution towards the original purchase, the location, use and condition of the property, and any disposition data including the date of disposal and sale price of the property." *Id.* at ¶ 23; *see also* 2 C.F.R. § 200.313(d).

But Anovion didn't keep those records. In fact, Anovion didn't keep any of the required information, except a description of the property. *See* Cplt., at ¶ 24 (Dckt. No. 1).

Czajka reported the discrepancy to two higher-ups: Brandi Abram (the Director of Government Programs) and Mark Grutza (the Controller). *Id.* at ¶¶ 20, 22.

Her concerns fell on deaf ears. Abram and Grutza dismissed her worries. *Id.* at ¶ 25. Abram told her that "complying with recordkeeping requirements for equipment that Anovion purchased with federal funds was 'unnecessary' and 'too transparent.'" *Id.*

A few weeks later, in September 2023, Abram gave Czajka some ominous news. Abram shared that the human resources department had reached out to discuss whether Czajka's position was necessary. *Id.* at ¶ 26.

*Anovion's Budget*

The other issue involved the company's budget.

In October 2023, Czajka was helping to prepare Anovion's quarterly progress report to the DOE. *Id.* at ¶ 27. Along the way, she discovered that Anovion had "significantly exceeded the budget" in several categories. *Id.* at ¶ 28. She also learned that Anovion had "failed to raise sufficient funds to satisfy its cost-share obligation for the quarter." *Id.* at ¶ 29.

Czajka raised these issues in a meeting with Abram, Grutza, and Sam Chong (the CFO) on October 12, 2023. *Id.* at ¶ 30. She told them that "Anovion was required by law and the terms of the grant agreement[] to report its failure to meet its cost-sharing obligations and to request approval from the DOE to revise its budget." *Id.* She also told them that "merely noting the over-budget variance in the quarterly report would not comply with federal regulations." *Id.* at ¶ 31.

3

Abram, Grutza, and Chong ignored Czajka's concerns. Chong told Czajka that "Anovion would not report the budget variance or its failure to meet its cost-sharing requirements in the manner required by law." *Id.* at ¶ 32.

On October 16, 2023, Czajka repeated her concerns in a follow-up email to Abram. *Id.* at ¶ 34. Once again, Czajka raised issues about the company's budget and cost-reporting. She wrote:

> I have been thinking about our conversation with Finance last Thursday. Sam [Chong] discussed the possibility of letting the DOE know that the amount of financing that we were able to get from other sources had changed and I had mentioned to Sam that we needed to put any changes to the budget or to the SOPO [Statement of Project Objectives] in writing. On Friday[,] Mark [Grutza] was sending you emails about changing the SOPO. Since Sam [Chong] was dismissive of my warnings and seemed to think that we could put any changes in a quarterly report even though I told him we cannot, you might want to direct him to the Terms and Conditions.

*Id.*

Several days later, Abram emailed Grutza about the budgetary situation, and copied Czajka. Abram wrote that Anovion would need to request a budget allocation from the DOE. *Id.* at ¶ 35. Abram recommended that Anovion put controls in place to address Anovion's "high percentage of overages." *Id.*

After that email, Czajka wasn't copied on any other communications related to the DOE grant. *Id.* at ¶ 36.

In the next few weeks, Czajka asked Abram several times about "the status of the quarterly report and Anovion's plan to report its budget violations." *Id.* at ¶ 37. But Abram refused to provide Czajka with any more information. *Id.* at ¶ 38.

Czajka's time at the company soon came to an end. She was terminated on November 10, 2023. *Id.* at ¶ 39. The termination came about four weeks after she sent her email to Abram that had raised concerns about the budget reporting.

Czajka responded to the termination by filing suit. She brings a retaliation claim under the False Claims Act, and a retaliatory-discharge claim under state law.

As Czajka sees things, the company is engaging in ongoing fraud so that it can keep getting federal funds. *Id.* at ¶ 46. The company "plan[ned] to make and/or use false records, to wit its quarterly budget report, in order to illegally maintain and/or procure additional funds from the federal government." *Id.*; *see also id.* at ¶ 47 ("Anovion's executives conspired to knowingly submit false information to DOE for the purposes of submitting a false claim for payment to the federal government, on behalf of Anovion."); *id.* at ¶ 50 ("Anovion's false records were material

to the government's payment decision. Anovion's grant agreement states that Anovion was required to comply with reporting and cost sharing requirements in order to keep funds it had already received and to receive future funding.").

Anovion moved to dismiss for failure to state a claim.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). When considering a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011).

To survive a Rule 12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Iqbal*, 556 U.S. at 678.

## Analysis

The Court will start with the retaliation claim under the False Claims Act, and will end with the retaliatory-discharge claim under state law.

### I.  False Claims Act

As the name suggests, the False Claims Act "imposes liability on anyone who 'knowingly' submits a 'false' claim to the Government." *See United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 742 (2023) (quoting 31 U.S.C. § 3729(a)). As an enforcement mechanism, the FCA "permits private parties to bring lawsuits in the name of the United States – called *qui tam* lawsuits – against those who they believe have defrauded the Federal Government." *Id.* at 743 (citing 31 U.S.C. § 3730(b)).

The FCA creates a cause of action for retaliation, too. The statute provides an umbrella of protection for individuals who take lawful steps to promote the purposes of the statute.

"Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." *See* 31 U.S.C. § 3730(h)(1).

A retaliation claim has three elements. "To state a retaliation claim under the FCA, a plaintiff must allege that she engaged in protected activity; the employer had knowledge of the

plaintiff's activity; and the discharge (or other adverse action) was motivated, at least in part, by the protected activity." *See Reed v. Colo. Tech. Univ.*, 2016 WL 1019830, at *3 (N.D. Ill. 2016). "To recover, a former employee must prove that she engaged in protected conduct and was fired because of that conduct." *See United States ex rel. Sibley v. Univ. of Chicago Med. Ctr.*, 44 F.4th 646, 661 (7th Cir. 2022).

Anovion argues that the complaint fails to state a retaliation claim. As the company sees things, the complaint does not allege any of the three elements, let alone all of them.

The Court will take them up, one at a time.

A.   **Protected Activity**

Anovion first argues that Czajka didn't engage in protected activity under the FCA. *See* Def.'s Mem. in Supp. of Mtn. to Dismiss, at 6 (Dckt. No. 10).

For present purposes, the last phrase of the statutory text does most of the heavy lifting. Again, the statute protects lawful acts done "in furtherance of an action under this section *or* other efforts to stop 1 or more violations of this subchapter." *See* 31 U.S.C. § 3730(h)(1) (emphasis added).

As the use of the disjunctive ("or") reveals, the statute covers two kinds of protected activity. The FCA protects lawful acts that go toward (1) bringing a claim under the Act, *or* (2) stopping a violation of the Act. *Id.*

The latter phrase is a relatively recent addition to the statutory text. For decades, the FCA has protected employees from retaliation for lawful conduct "in furtherance of an action under this section." *Id.* That language "reached conduct that put an employer 'on notice of potential [False Claims Act] litigation.'" *See Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012) (quoting *Brandon v. Anesthesia & Pain Mgmt. Assocs.*, 277 F.3d 936, 944 (7th Cir. 2002)). But in 2009, Congress amended the statute and extended the blanket of protection to employees who undertake "other efforts to stop" violations of the Act. *Id.* (quoting 31 U.S.C. § 3730(h)(1)).

The disjunctive statutory text creates two possible routes for stating a retaliation claim. One path involves conduct "in furtherance of an action" (meaning a lawsuit) under the FCA. And the other path involves efforts to "stop" a violation of the Act.

Here, the first possible route is a dead end. The complaint falls short of alleging that the company retaliated against Czajka for doing something "in furtherance of an action under this section." *Id.*

The FCA does not reach any and all run-of-the-mill statements by an employee that the employer is not complying with federal requirements connected to federal funds. Voicing concerns about non-compliance isn't enough.

6

The text applies to steps taken "in furtherance of an action," which means that the conduct must have a connection to a potential lawsuit under the FCA. *See* 31 U.S.C. § 3730(h)(1). Investigating a potential lawsuit counts as a protected activity. *See Fanslow v. Chicago Mfg. Ctr., Inc.*, 384 F.3d 469, 481 (7th Cir. 2004) ("Congress intended to protect employees from retaliation while they are collecting information about a possible fraud, before they have put all the pieces of the puzzle together."); *Lang v. Northwestern Univ.*, 472 F.3d 493, 494 (7th Cir. 2006) ("[T]he statute covers investigations that, although reasonable in prospect, do not pan out and thus do not lead to actions under the False Claims Act.").

The employee doesn't have to invoke the FCA per se. The FCA doesn't require statutory name-dropping. But the employee does have to do enough or say enough so that the proverbial lightbulb will go off in the employer's head about a potential lawsuit on the horizon.

The Seventh Circuit reinforced the point in *Brandon*. There, an employee raised concerns about a company's billing practices, including whether certain doctors were "falsifying the bills they submitted to Medicare." *See Brandon*, 277 F.3d at 938. He "suspect[ed] that several of the shareholders were making alterations to reports or otherwise falsifying reports in order to receive Medicare reimbursement at rates higher than the rates to which APMA was entitled by law." *Id.* at 939.

So he raised questions at a shareholders meeting about the billing practices, and even pointed them to relevant Medicare rules. A few weeks later, he was let go.

The employee brought a retaliation claim, but the Seventh Circuit held that the conduct did not fall under the then-current retaliation provision of the FCA (*i.e.,* before the 2009 amendment). Flagging violations of federal requirements, without more, wasn't protected activity.

The Seventh Circuit held that the termination didn't involve actions taken "in furtherance of an action" under the FCA. Basically, the employee didn't do enough to put the company on notice of a potential lawsuit. "Under the circumstances here, we cannot find that APMA would have realized that it faced the 'distinct possibility' of such an action." *Id.* at 944 (citation omitted).

The fact that the employee used words like "illegal," "improper," and "fraudulent" didn't move the needle. *Id.* The employee "never explicitly told" the shareholders that he believed that "they were violating the FCA," and he "never threatened to bring a *qui tam* action." *Id.* He "never threatened to report their conduct to the government," either. *Id.*

At best, the employee "was simply trying to convince the shareholders to comply with the Medicare billing regulations. Such conduct is usually not protected by the FCA." *Id.* And in a similar vein, "such conduct usually does not put an employer on notice of potential FCA litigation." *Id.*

Along the way, the Seventh Circuit pointed out that the employee's job responsibilities included ensuring that billing practices complied with Medicare rules and regulations. *Id.* at 945.

7

Given that reality, the company wouldn't have any reason to think that the employee was about to launch a lawsuit. "[T]he fact that Brandon was alerting his supervisors to the possibility of their non-compliance with the rules would not necessarily put them on notice that he was planning to take a far more aggressive step and bring a *qui tam* action against them or report their conduct to the government." *Id.*

Judge Feinerman landed in the same place in *United States ex rel. Rockey v. Ear Inst. of Chicago, LLC*, 92 F. Supp. 3d 804, 828 (N.D. Ill. 2015). There, too, an employee raised questions about compliance with Medicare billing practices. Following the Seventh Circuit's lead in *Brandon*, Judge Feinerman held that the complaint failed to state a claim for retaliation for conduct "in furtherance of an action" under the FCA. *Id.* at 827–28.

The decisions in *Brandon* and *Rockey* reveal how the complaint at hand falls short (under the first prong, that is). Like the employees in *Brandon* and *Rockey*, Czajka raised questions and expressed concerns about whether her employer had complied with requirements tied to federal funds. But Czajka did not invoke the FCA, or threaten legal action, or flag a potential lawsuit, or anything along those lines.

Czajka spoke up about non-compliance. But she didn't speak up about the possibility of escalating the situation to litigation.

True, the statute doesn't require an employee to have knowledge of the FCA to engage in protected activity. *See Fanslow*, 384 F.3d at 479. Legal expertise isn't necessary. An employee doesn't have to use magic words, or use the right legal terminology, either.

But litigation must be a "distinct possibility." *Id.* And the test includes both subjective and objective elements. The question is whether "(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government." *Id.* at 480.

An employee must do more than allege that a company isn't doing what it is supposed to do. The first prong of the statutory text focuses on the prospect of bringing an "action." *See* 31 U.S.C. § 3730(h)(1). An employee must speak up in such a way that potential litigation is on the company's radar screen.

And here, the complaint alleges no such thing. Czajka raised concerns, but she didn't do anything to raise the prospect of litigation.

But the statute gives another opening for stating a claim, thanks to the other branch of the textual fork in the road. A person can bring a retaliation claim about "efforts to stop 1 or more violations of this subchapter." *Id.*

The two disjunctive parts of the statutory text use two different nouns, and they reveal two different focal points. The first provision covers conduct relating to an "action," meaning a lawsuit under the FCA. *Id.* But the second provision covers conduct about a "violation" of the FCA. *Id.* The second provision is about a violation of the statute, without regard to whether

8

someone might bring a lawsuit. The second provision is about stopping a violation, not starting litigation.

The difference might seems small, or nuanced, but it packs a substantive punch. The second provision protects actions that an employee takes to stop a violation of the FCA. The employee doesn't have to flag the possibility of bringing a *lawsuit*, because the second provision isn't about enforcing the FCA in a courtroom. The second provision is about stopping a violation of the FCA in the first place. So notice about a potential lawsuit isn't required.

The complaint at hand adequately alleges that Czajka made efforts to stop a violation of the FCA.

The complaint alleges that the company received federal funds, based on an agreement that imposed certain obligations on the company. The complaint also alleges that the company failed to live up to those obligations.

Standing alone, not every run-of-the-mill failure to live up to one's end of the bargain is a fraud. The federal government undoubtedly enters into a blizzard of contracts, and it can't be unusual for companies in the private sector to fall short of their end of the deal. A failure to comply with federal rules and regulations, in and of itself, is not automatically a fraud.

The False Claims Act is not a jack-of-all-trades statute for addressing any and all compliance issues. *See United States v. Walgreen Co.*, 417 F. Supp. 3d 1068, 1089 (N.D. Ill. 2019) (distinguishing between allegations of false claims for payment and allegations of immaterial compliance issues); *United States v. Molina Healthcare of Illinois, Inc.*, 2019 WL 3555336, at *3 (N.D. Ill. 2019) (Kendall, J.) (similar).

But here, the complaint does more than allege that the company failed to comply with federal regulations. The complaint alleges that the company had "plans" to "use false records" to "maintain and/or procure additional funds from the federal government." *See* Cplt., at ¶ 46.

The complaint stops short of saying that Anovion submitted any false reports to the government. But it does say that the company had plans to submit false reports in the future. *Id.* And the complaint alleges that the company failed to "immediately provide written notification to the DOE" of its failure to meet its cost-sharing obligations. *Id.* at ¶ 16.

At the motion-to-dismiss stage, those allegations are enough to give Anovion notice of the claim.

True, Czajka expressed her concerns within the company, without reaching out to the government. But a retaliation claim can involve internal complaints, too.

A relator can bring a retaliation claim even if that person never reported the alleged misconduct to the government. Voicing concerns within a company is a protected activity, and is enough to give rise to a retaliation claim. *See Halasa*, 690 F.3d at 847–48 ("In 2009, Congress amended the statute to protect employees from being fired for undertaking 'other efforts to stop'

9

violations of the Act, such as reporting suspected misconduct to internal supervisors.") (citation omitted); *Fanslow*, 384 F.3d at 481 ("[T]here are sound reasons for finding that internal complaints are protected.").[1] "[W]hat more can a lower-level employee like [Czajka] realistically do to stop a potential FCA violation than report it to a supervisor?" *See United States ex rel. Rockey v. Ear Inst. of Chicago, LLC*, 92 F. Supp. 3d 804, 828 (N.D. Ill. 2015) (Feinerman, J.).

In a similar vein, the complaint states a claim even though it alleges future violations. The FCA applies to future violations of the statute, meaning false claims that haven't yet happened. So, the statute protects *preventative* conduct, too. *See Halasa*, 690 F.3d at 848 ("Halasa investigated these claims and reported his findings to Ortega, Hemphill, and Carpentier, presumably to ensure that ITT ended these practices and to prevent ITT from making any false certifications to the U.S. Department of Education in connection with its PPA. We are satisfied that Halasa's evidence would permit a trier of fact to find that he engaged in 'efforts to stop' potential FCA violations."); *Sibley*, 44 F.4th at 663 ("The alleged facts . . . permit an inference that Sibley was fired 'because of' her efforts to stop potential violations of the FCA.").

The phrase "efforts to stop . . . violations" includes both stopping on ongoing violation and stopping a violation from happening in the first place. *See* 31 U.S.C. § 3730(h)(1). The statute applies to ongoing financial train wrecks, and upcoming train wrecks that are down the track.

A retaliation claim also does not require the relator to bring a *qui tam* claim, either. "A plaintiff may proceed under subsection (h) independently of a *qui tam* action." *See Fanslow*, 384 F.3d at 479.

All in all, this Court concludes that Czajka has adequately alleged that she engaged in a protected activity.

### B.     Knowledge

Next, Anovion argues that the complaint fails to allege that the company knew about her protected activity before her termination. *See* Def.'s Mem. in Supp. of Mtn. to Dismiss, at 9 (Dckt. No. 10). That argument is hard to square with the complaint.

Czajka alleges that she reported suspected misconduct to three different supervisors, at three different levels of the food chain. She reported her concerns about Anovion's deficient property records to Abram and Grutza. *See* Cplt., at ¶¶ 22–23 (Dckt. No. 1). Abram and Grutza were high up in the pecking order. Abram was Anovion's Director of Government Programs, and Grutza was Anovion's Controller. *Id.* at ¶¶ 20, 22.

---

[1] In *Fanslow*, the Seventh Circuit appears to have walked back its statement in *Brandon* that employees who "choose to raise their concerns privately within their firm or company, rather than publicly, simply do not qualify for the FCA claim." *See Brandon*, 277 F.3d at 944.

On the issue of budget reporting, Czajka voiced her concerns to Abram and Grutza. *Id.* at ¶ 30. And she didn't stop there. Czajka also informed Chong, the Chief Financial Officer, about the budget reporting. *Id.*

Those allegations are more than enough to allege knowledge. "If an officer of a corporation has knowledge or notice of a fact, that knowledge or notice is generally imputed to the corporation." *See Fifth Third Mortg. Co. v. Kaufman*, 2017 WL 4021230, at *12 (N.D. Ill. 2017), *aff'd*, 934 F.3d 585 (7th Cir. 2019). So, Czajka's allegations are enough to support the inference that Anovion knew of Czajka's internal reporting before she was fired.

Maybe discovery will reveal that her termination had nothing to do with the concerns that she raised. Maybe the decisionmakers who let her go had no idea that she had spoken up about the company's non-compliance. Time will tell. But for now, the claim survives.

Anovion argues that it didn't know about Czajka's protected activity because she didn't engage in any protected activity at all. But that's an argument about the status of her conduct. It's not about the company's knowledge of her conduct. It repeats and repackages the earlier argument about whether the statute applies at all. And this Court has already held that the complaint alleges that Czajka engaged in protected activity.

The complaint has sufficiently alleged that the company knew about Czajka's protected activity.

        **C.**      **Causation**

The last argument is about causation. The statute requires a plaintiff to show that he or she suffered an adverse action "because of" protected activity. *See* 31 U.S.C. § 3730(h)(1).

Anovion argues that the complaint fails to allege that Czajka's protected activity caused her termination. *See* Def.'s Mem. in Supp. of Mtn. to Dismiss, at 11 (Dckt. No. 10). Anovion attempts to raise the bar, arguing that the complaint must allege that the protected activity was the "sole basis" for her termination. *Id.*

The standard for causation isn't as high as Anovion contends. To state an FCA retaliation claim, Czajka needs to show that her termination "was motivated, *at least in part*, by the protected activity." *Reed*, 2016 WL 1019830, at *3 (emphasis added); *see also Brandon*, 277 F.3d at 944 (requiring an FCA plaintiff to show on summary judgment that "the discharge was motivated, at least in part, by the protected conduct"); *Fanslow*, 384 F.3d at 485 (same). A mixed motive clears the bar.

True, that standard sits uneasily with the Supreme Court's interpretation of the phrase "because of" in other contexts. Time and again, the Supreme Court has read "because of" to require "but-for causation." *See, e.g.*, *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020) (Title VII discrimination); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 350 (2013) (Title VII retaliation); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009) (ADEA).

11

But, as this Court explained in another case, this Court takes its marching orders from the Seventh Circuit. "[T]he Seventh Circuit has not revisited the causation standard for retaliation claims under the False Claims Act." *See Burke v. Amedisys, Inc.*, 2022 WL 3226797, at *13 (N.D. Ill. 2022). "[I]t is not this Court's place to depart from the Seventh Circuit case law, even if it seems inconsistent with later interpretations by the Supreme Court." *Id.*

In any event, the complaint passes muster under either standard. Czajka has alleged that, a few weeks after she reported the issue about the property records, Anovion started contemplating the necessity of her position. *See* Cplt., at ¶ 26 (Dckt. No. 1). Likewise, a few weeks after she raised the issue about the budget reporting, Anovion terminated her. *Id.* at ¶¶ 39–40.

The allegations are enough to get the ball rolling at the motion-to-dismiss stage, when notice pleading is all that matters. *See* Fed. R. Civ. P. 8. The temporal proximity creates an inference of a connection. And at the opening stage of the case, a complaint doesn't have to do much to create an inference.

The complaint offers enough factual content to support causation, regardless of which standard applies. "The complaint alleges enough facts to support a plausible inference that her decision to speak up was the but-for cause of her termination. So the allegations necessarily satisfy the mixed-motive standard, too." *See Burke*, 2022 WL 3226797, at *14.

## II.     Retaliatory Discharge

Czajka also brings a state-law claim of retaliatory discharge.

The tort of retaliatory discharge is a narrow exception to the general rule of at-will employment. *See Bella v. Gambro, Inc.*, 584 N.E.2d 104, 107 (Ill. 1991). "To establish a cause of action for retaliatory discharge, a plaintiff must demonstrate that (1) he was discharged in retaliation for his activities; and (2) the discharge is in contravention of a clearly mandated public policy." *See Jacobson v. Knepper & Moga, P.C.*, 706 N.E.2d 491, 493 (Ill. 1998).

The phrase "clearly mandated public policy" isn't as sweeping as it might first appear. Illinois courts have narrowed it down to apply to two specific settings. A retaliatory discharge claim can arise when an employee suffers an adverse action for seeking workers' compensation, or for engaging in whistleblowing.

"While there is no precise definition of what constitutes clearly mandated public policy, a review of Illinois case law reveals that retaliatory discharge actions have been allowed in two settings: where an employee is charged for filing, or in anticipation of filing, a claim under the Workers' Compensation Act; or where an employee is discharged in retaliation for the reporting of illegal or improper conduct, otherwise known as 'whistleblowing.'" *See Michael v. Precision All. Grp., LLC*, 21 N.E.3d 1183, 1188 (Ill. 2014) (quoting *Jacobson*, 706 N.E.2d at 493)).

Czajka doesn't allege that she filed (or was planning to file) a claim under the Illinois Workers' Compensation Act, 820 ILCS 305/1. So the question is whether Czajka's discharge was in retaliation for something fairly characterized as "whistleblowing" under state law.

As Anovion sees things, Czajka's retaliatory-discharge claim fails because the complaint does not allege conduct protected by the Illinois Whistleblower Act. That statute applies to whistleblowers who speak to the government. *See* 740 ILCS 174/15. The statute also applies to whistleblowers who refuse to participate in unlawful activity. *See* 740 ILCS 174/20. But here, the complaint alleges neither one. So, as the company sees things, the complaint doesn't allege that Czajka blew any whistles.

That argument has some intuitive appeal. A claim of retaliatory discharge applies to whistleblowing, and the Illinois Whistleblower Act defines what whistleblowing means. It's not much of a leap to think that a retaliatory discharge claim about whistleblowing must involve conduct covered by the Illinois Whistleblower Act.

But Illinois courts have not gone in that direction. A claim of retaliatory discharge about whistleblowing doesn't have to involve conduct that falls within the Illinois Whistleblower Act. *See Sweeney v. City of Decatur*, 79 N.E.3d 184, 191 (Ill. App. Ct. 2017).

That is, the Illinois Whistleblower Act does not define the parameters of a claim about whistleblowing under the common-law tort of retaliatory discharge. Simply put, "[t]he statute and the common-law action cover distinct subjects (although they may overlap)." *See Stiles v. Int'l BioResources, LLC*, 726 F. Supp. 2d 944, 950 (N.D. Ill. 2010) (Dow, J.).

In other words, the common-law claim and the statute both apply to whistleblowing, but they cover different spheres of activity. The same conduct can give rise to a common-law claim of retaliatory discharge *and* a claim under the Illinois Whistleblower Act. But not always.

Sometimes conduct can give rise to a common-law claim of retaliatory discharge but not a claim under the Illinois Whistleblower Act. And sometimes conduct can give rise to a claim under the Illinois Whistleblower Act but not a common-law claim of retaliatory discharge. They create a Venn diagram with overlapping territory, but not concentric circles.

In some ways, the Illinois Whistleblower Act is broader. For example, it applies to all forms of retaliation. But a common-law claim of retaliatory *discharge* applies only to firings. *Id.*

In other ways, the Illinois Whistleblower Act is narrower. The statute protects an employee only where she "reports legal violations to government officials" or "refus[es] to take unlawful activity." *Id.* at 950–51. But a common-law claim of retaliatory-discharge tort covers firings "whether the underlying complaints were made to government officials *or the employer*." *Id.* (emphasis added) (collecting cases).

Anovion misses the mark by tethering the retaliatory discharge claim to the Illinois Whistleblower Act. The company points out that Czajka doesn't allege that she reported any

13

violations to government officials, or that she otherwise refused to take unlawful activity. But the statute does not define the scope of the common-law claim.

Anovion doesn't make any other arguments for dismissing Czajka's retaliatory-discharge claim, so that claim survives.

## Conclusion

For the foregoing reasons, Defendant Anovion's motion to dismiss is denied.

Date: August 6, 2025

Steven C. Seeger
United States District Judge